UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH SCOFERO,

          Plaintiff,

  -vs-

VNA HOMECARE OPTIONS, LLC; SAMUEL
D. ROBERTS, in his official
capacity as Commissioner of the New
York State Office of Temporary and
Disability Assistance; and HOWARD
ZUCKER, in his official capacity as
Commissioner of the New York State
Department of Health,

          Defendants.

**DECISION AND ORDER
No. 6:17-cv-06391(MAT)**

---

### INTRODUCTION

Represented by counsel, Joseph Scofero ("Plaintiff") instituted this action pursuant to the Due Process clause of the Fourteenth Amendment to the U.S. Constitution, Title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396w-5 ("the Medicaid Act")), and Article 2 of the New York Social Services Law, to enforce a Medicaid "fair hearing" decision that ordered VNA Homecare Options LLC. ("VNA") to enroll Plaintiff in its Community Based Managed Long Term Care Program and authorize 24-hour care at discharge. The Court has jurisdiction over this matter pursuant to, inter alia, 28 U.S.C. § 1331.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The Parties

Plaintiff is a 70-year-old Medicaid beneficiary. As the result of suffering a stroke in January 2015, Plaintiff is paralyzed on the left side of his body and is unable to walk on his own. He currently resides at Brighton Manor, a skilled nursing facility located in Monroe County, New York, where he receives 24-hour medical care. Plaintiff owns a house in Wayne County, New York, and wishes to return home. The parties all agree that if Plaintiff were to return home, he requires 24-hour care.

Howard Zucker is Commissioner of the New York State Department of Health ("DOH") and is charged with administering the New York State Medicaid program consistent with the federal Medicaid Act. Samuel D. Roberts is the Commissioner of the New York State Office of Temporary and Disability Assistance ("OTDA") and is responsible for the administration of, inter alia, Medicaid fair hearings and ensuring compliance with fair hearing decisions.

VNA operates a Medicaid Managed Long Term Care ("MLTC") Plan under a Certificate of Authority from DOH. As an MLTC Plan, VNA arranges for, inter alia, long term care services, on a capitated basis in accordance with New York Public Health Law ("NYPHL") § 4403-f, for non-dual eligible individuals, aged 18 years and older, who have been assessed as eligible for nursing home level of care at the time of enrollment and also assessed as needing community

-2-

based long term care services for more than 120 days.[1] As a DOH contractor, VNA is required to, among other things, maintain and demonstrate to DOH's satisfaction, a sufficient and adequate network for the delivery of all covered services. VNA provides care management services to its enrollees, but does not directly provide hands-on care to such enrollees. Rather, the MLTC Plan arranges, through a network of contracted providers, for the provision of covered services. Pursuant to the MLTC Model Contract, VNA is required to have a minimum of two providers that are accepting new Plan enrollees in each county in its service area for each covered service in the benefit package.[2]

## II.  Plaintiff's Pursuit of 24-Hour In-Home Care

On April 12, 2016, Plaintiff was assessed by Lori McPhee ("McPhee"), an enrollment nurse with VNA, who noted that Plaintiff used a wheelchair due to left side flaccid hemiplegia, and was unable to lift his left arm independently. McPhee evaluated Plaintiff's status in various domains of functioning and opined that he required maximal assistance in managing his medications, dressing his lower body, transferring to the toilet, using the

---

[1]     VNA's obligations as an MLTC Plan are set forth in its contract with the DOH. The template of the Managed Long Term Care Partial Capitation Contract ("MLTC Model Contract") may be accessed at https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model.pdf.

[2]     In Wayne County, where Plaintiff's home is located, VNA maintains a network of service providers that includes Lifetime Care, HomeCare PLUS, Visiting Nurse Service of Rochester, Finger Lakes Visiting Nurse Service, and HCR Home Care.

toilet, and getting in and out of bed; and extensive assistance in bathing and dressing his upper body.

By letter dated April 14, 2016, VNA informed Plaintiff that he had been "found to be ineligible" for enrollment in the MLTC Plan because he was "incapable of returning to or remaining in [his] home and community without jeopardy to [his] health or safety." On May 27, 2016, VNA sent Plaintiff a second letter (Dkt #10-1, pp. 28-29 of 30) indicating that New York Medicaid Choice ("Maximus"), DOH's conflict-free evaluator, had been notified of the MLTC Plan's determination and would make the final determination on enrollment.

On June 15, 2016, Maximus informed Plaintiff by letter that it was affirming VNA's decision to deny his enrollment in the MLTC Plan because "[t]he plan showed proof that they cannot ensure [his] physical safety while providing services."

## III. The Medicaid Fair Hearing

On August 10, 2016, Plaintiff requested a Medicaid fair hearing to challenge the denial of enrollment by VNA, and Maximus' affirmance of that denial. Following a hearing on December 23, 2016, an administrative law judge ("the ALJ") issued a decision on January 18, 2017 ("the Fair Hearing Decision") (Dkt #10-1, pp. 12-23 of 30), reversing VNA's determination to deny Plaintiff enrollment in the MLTC Plan.

On February 1, 2017, Plaintiff's attorney representative at the fair hearing filed a Request for Compliance with OTDA. By

letter dated February 14, 2017, OTDA notified Plaintiff that "the Agency [VNA] has taken appropriate action to comply with the directives of [the Fair Hearing Decision][,]" and OTDA therefore "will regard this matter as satisfactorily resolved . . . ." (Dkt #3-7, p. 30 of 34).

Meanwhile, VNA filed a Request for Reconsideration (Dkt #10-1, pp. 1-11 of 30) with OTDA on February 7, 2017, seeking reversal of the Fair Hearing Decision on the grounds that the ALJ erred as a matter of law in her interpretation of the regulatory notice requirements and application of the regulatory burden of proof. VNA also argues that the ALJ made a medical determination she was unqualified to make regarding Plaintiff's enrollment in the Plan. On July 17, 2017, OTDA sent a letter to Plaintiff's attorney representative at the fair hearing, Ross Pattisson, Esq., advising him of VNA's Request for Reconsideration and stating that if he wishes to respond on Plaintiff's behalf, he must do so by August 1, 2017. The letter notes that "the original decision remains in effect."[3]

On February 9, 2017, VNA pre-enrolled Plaintiff in the MLTC Plan effective March 1, 2017, and authorized 24-hour in-home care. On April 3, 2017, a VNA representative contacted nine different home-care service providers; on April 12, 2017, a VNA

---

[3] "During the pendency of any review of an issued fair hearing decision, the original decision is binding and must be complied with by the agency." N.Y. COMP. CODES R. & REGS. tit. 18, § 358-6.6(a)(4).

representative contacted a tenth provider; and on June 23, 2017, a VNA representative re-contacted six of the foregoing ten service providers, as well as three new providers. (See Dkt #11, pp. 3-4 of 6). All of these agencies declined to provide services. On June 26 and 27, 2017, a VNA representative re-contacted five of the previously contacted providers that provide services in Wayne County. However, VNA indicates, none of these agencies would accept Plaintiff because they do not have enough staff to provide 24-hour care, and Plaintiff lacks an emergency back-up plan in the event an agency employee does not appear for a scheduled shift.

VNA avers that it also explored providing services to Plaintiff under the Consumer Directed Personal Assistance Services Benefit, which provides greater flexibility in areas with shortages of home-health aides. In order to have a Consumer Directed Aide ("CDA"), the MLTC Model Contract imposes a number of requirements on the plan enrollee seeking in-home care. Specifically, the patient must be determined to be self-directing and have the authority to make decisions regarding the recruitment, training, scheduling, evaluation, time sheet verification and approval, and discharge of the CDA. In other words, the enrollee must be able to act as the employer of the CDA. If the enrollee does not have such capacity, he may designate a representative to assist with these responsibilities. VNA requested a consultative psychiatry examination to assess whether Plaintiff has the capacity to conduct

the employer responsibilities relative to the CDA. VNA also reached out to four individuals identified by Plaintiff who might be able to assist him. Three of the four contacts stated that they could not assist Plaintiff with these CDA employer functions, and the fourth person did not respond to VNA's multiple inquiries.

As of June 27, 2017, VNA indicated that it was canvassing providers outside of its contracted provider network to determine if there is a different agency operating in Wayne County that might accept Plaintiff into service. To date, VNA has been unable to secure an agency willing and able to provide the 24-hour care that Plaintiff requires. Plaintiff remains a patient at Brighton Manor.

## IV.  The Preliminary Injunction Motion

Presently before the Court is Plaintiff's motion seeking a mandatory preliminary injunction that "1. [e]njoins Defendant VNA from failing to comply with the fair hearing decision issued January 18, 2017; 2. [e]njoins State Defendants Roberts and Zucker from failing to ensure compliance with the fair hearing decision issued January 18, 2017; and 3. [e]njoins State Defendants Roberts and Zucker from failing to ensure that Defendant VNA timely comply with the fair hearing decision issued January 18, 2017, by ensuring that Defendant provide the services ordered in it." (Pl's  Mem. (Dkt #3-2) at 24). VNA opposed the motion with several declarations and a memorandum of law. Plaintiff filed a reply. DOH and OTDA have not responded to the motion for a preliminary injunction.

For the reasons discussed herein, the Court denies without prejudice Plaintiff's motion for a mandatory preliminary injunction.

## DISCUSSION

## I.  Standard for Obtaining a Mandatory Preliminary Injunction

The Second Circuit has explained that "[a] party seeking a preliminary injunction must show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Cacchillo v. Insmed, Inc., 638 F.3d 401, 405-06 (2d Cir. 2011) (quoting Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) ("Citigroup")). As the Second Circuit has emphasized, "[i]rreparable harm  is '"the single most important prerequisite for the issuance of a preliminary injunction."'" Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999) (quoting Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 Charles Alan Wright, et al., Federal Practice & Procedure § 2948 at 431 (1st ed. 1973))). In this Circuit, a party seeking preliminary injunctive relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury. E.g., Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). "Likelihood sets, of course,

a higher standard than 'possibility.'" <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 79 (2d Cir. 1990).

Where, as here, the moving party seeks "a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo[,]" <u>Citigroup</u>, 598 F.3d at 35 n. 4 (internal quotation marks and brackets omitted), "[t]he burden is even higher[.]" <u>Cacchillo</u>, 638 F.3d at 401 (citation omitted).[4] The Second Circuit explained that "if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief. Otherwise, there is no reason to impose a higher standard." <u>Doherty</u>, 60 F.3d at 34 (citation omitted). Thus, the Second Circuit has emphasized that "[a] mandatory preliminary injunction 'should issue only upon a *clear showing* that the moving party is entitled to the relief requested, *or where extreme or very serious damage* will result from a denial of preliminary relief.'" <u>Cacchillo</u>, 638 F.3d at 401 (quoting <u>Citigroup</u>, 598 F.3d at 35 n. 4 (internal

---

[4]   <u>See also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 34 (2d Cir. 1995) ("<u>Doherty</u>") ("A heightened standard has also been applied where an injunction—whether or not mandatory—will provide the movant with substantially 'all the relief that is sought.'") (quoting <u>Abdul Wali v. Coughlin</u>, 754 F.2d at 1026; citing 11 Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 2948, at 445-47 (1973)).

quotation marks omitted in original; emphases added)). Because Plaintiff seeks a mandatory preliminary injunction, the Court will address the two factors necessary for him to meet the higher burden required in such a case: (1) a "clear showing" of entitlement to relief; or (2) that "extreme or very serious damage" will result if this Court denies injunctive relief. See Cacchillo, 638 F.3d at 401.

**A.    Clear Showing of Entitlement to Relief Requested**

The first claim in Plaintiff's complaint asserts that his rights under the Due Process Clause of the 14th Amendment have been violated by VNA's "failure to comply" with the Fair Hearing Decision. The "Decision and Order" portion of the Fair Hearing Decision states as follows:

> The determination to deny [Plaintiff]'s request for enrollment in [VNA]'s Community Based Long Term Care Program is not correct, and is reversed.
>
> 1. [VNA] is directed [to] *enroll* [Plaintiff] in its Community Based Managed Long Term Care Program and *authorize* 24 hour care at discharge.
>
> As required by 18 NYCRR 358-6.4,[5] [VNA] must comply immediately with the directives set forth above.

(Dkt #10-1, p. 22 of 30) (emphases supplied).

As discussed above, on February 9, 2017, VNA pre-enrolled Plaintiff in the MLTC Plan and authorized 24-hour in-home care.

_____

[5]

"For all decisions, except those involving food stamp issues only, definitive and final administrative action must be taken promptly, but in no event more than 90 days from the date of the request for a fair hearing." N.Y. COMP. CODES R. & REGS. tit. 18, § 358-6.4

Plaintiff's enrollment was scheduled to be effective March 1, 2017. Plaintiff does not dispute that VNA enrolled him in the MLTC Plan and authorized 24-hour care upon his discharge from Brighton Manor, but argues that this does not constitute compliance with the Fair Hearing Decision. According to Plaintiff, VNA has not done enough to secure a service provider to provide him with 24-hour in-home care. Plaintiff asserts that there is "far more" VNA should have done, such as offer financial incentives to the homecare agencies or contract with multiple agencies in order to obtain 24-hour coverage. However, Plaintiff has not pointed to any regulations that impose such requirements on agencies such as VNA.

Plaintiff also cites 42 C.F.R. § 438.206(c)(1)(iii), a Medicaid regulation dealing with the furnishing of services, which provides that "[t]he State must ensure that each contract with a MCO [Managed care organization], PIHP [Prepaid inpatient health plan], and PAHP [Prepaid ambulatory health plan] complies with [a number of] requirements[,]" including that "[e]ach MCO, PIHP, and PAHP must[,]" among other things, "[m]ake services included in the contract available 24 hours a day, 7 days a week, when medically necessary." 42 C.F.R. § 438.206(c)(1)(iii). Plaintiff points out that "[i]f the provider network is unable to provide necessary services, covered under the contract, to a particular enrollee, the MCO, PIHP, or PAHP must adequately and timely cover these services out of network for the enrollee, for as long as the MCO, PIHP, or

-11-

PAHP's provider network is unable to provide them." 42 C.F.R. §
438.206(b)(4). Plaintiff asserts that VNA has "provide[d] no clear
evidence" that it has sought services outside its network.

However, a VNA representative has averred, in a declaration
dated June 27, 2017, that VNA is in the process of canvassing
providers outside of its contracted provider network to determine
if there is a different agency operating in Wayne County that might
accept Plaintiff into service. (See Declaration of Deborah
Maciewicz (Dkt #11), ¶ 22). Thus, it appears to the Court that VNA
is complying with its obligations under the applicable Medicaid
regulation but, regrettably, has been unsuccessful to date in
securing out-of-network provider coverage.

Plaintiff next cites a provision in the MLTC Model Contract
that covers the situation when "the Contractor [VNA] determines
that it lacks access to sufficient or adequate resources to provide
or arrange for the safe and effective delivery of Covered Services
to additional Enrollees." In such case, "[t]he Contractor will
request written permission from the Department to suspend
enrollment[,]" and "[r]esumption of enrollment will occur only with
Department approval, not to be unreasonably delayed, after written
notice from the Contractor that adequately describes how the
situation precipitating the suspension was corrected." VNA may
eventually determine it is in the position covered by this
provision, and must request suspension of enrollment into its

-12-

plans. However, even if that is the case, the MLTC Model Contract does not provide for the equitable remedy sought by Plaintiff. Indeed, if VNA is in the situation of having to request suspension of enrollment, it is precisely because it cannot arrange for delivery of covered services, i.e., 24-hour in-home care.

Plaintiff's second cause of action is based on the "fair hearing" provision of the Medicaid statute which requires that a "State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]" 42 U.S.C. § 1396a(a)(3). The remedy for a violation of this subsection would appear to be a "fair hearing." Here, Plaintiff received a Fair Hearing before an administrative law judge, and obtained a favorable decision. This claim arguably is moot.

Plaintiff's third cause of action is based on Medicaid's "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), which requires State Medicaid plans to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals. 42 U.S.C. § 1396a(a)(8). Plaintiff notes that the Medicaid Act defines "medical assistance" as "payment of part or all of the cost of . . . care and services or the care and services themselves, or

-13-

both." 42 U.S.C. § 1396d(a). Plaintiff asserts that this creates a federally enforceable private right of action, the remedy for which is the provision, by VNA, of the 24-hour in-home services he needs. Plaintiff acknowledges that the Second Circuit has not addressed the question of whether 42 U.S.C. § 1396a(a)(8) creates privately enforceable rights. The fact that it is an open question in this Circuit undermines any claim that he has made a "clear showing" of entitlement to relief based on an alleged violation of Section 1396a(a)(8). Moreover, even if the Second Circuit were to follow the majority of circuits that have found or assumed a privately enforceable right under Section 1396a(a)(8), it is unclear what constitutes compliance with, or a violation of, the reasonable promptness provision, since the "Medicaid Act does not define a specific time limit for 'reasonable promptness' for furnishing medical assistance." Hanley v. Zucker, No. 15-CV-5958(KBF), 2016 WL 3963126, at *3 (S.D.N.Y. July 21, 2016) (citing 2001 guidance letter issued by the Centers for Medicare and Medicaid Services in the U.S. Department of Health and Human Services which states that Section 1396a(a)(8)'s "reasonable promptness" requirement is ultimately "governed by a test of reasonableness," taking into consideration the "urgency of an individual's need, the health and welfare concerns of the individual, the nature of services required, the potential need to increase the supply of providers, the availability of similar or alternative services, and similar

variables"). There are a number of factors, outside of VNA's control, that have contributed to delay, including the extensive nature of Plaintiff's medical and personal care needs; the fact that he requires round-the-clock, in-home care services; the need for VNA to look outside of its network of care providers due to the refusal of in-network agencies to assume Plaintiff's case; and the unwillingness of Plaintiff to allow VNA to have contact with any of his family members for purposes of exploring the consumer-directed care option. The home care agencies—not VNA—are the ultimate providers of the "medical assistance" which Plaintiff asserts he has not received with "reasonable promptness." However, the home care agencies are not parties to this action, and the Court has no jurisdiction over them.

At this stage of the proceeding, Plaintiff has failed to make a "clear showing," <u>Cacchillo</u>, 638 F.3d at 401, that he is entitled to the relief requested.

### B.   Extreme or Very Serious Damage Absent Injunction

The Court now considers whether Plaintiff can demonstrate that "extreme or very serious damage," <u>Cacchillo</u>, 638 F.3d at 401, will result to him if the mandatory injunctive relief is not issued. Plaintiff cannot demonstrate a likelihood of irreparable harm. He therefore necessarily cannot fulfill the heightened showing required in the context of mandatory injunctions, that is, "extreme or very serious damage" in the absence of relief.

-15-

The "irreparable harm" cases on which Plaintiff relies in his initial memorandum of law largely deal with situations where the movants face "[a] lack of medical services[,]" Fishman v. Paolucci, 628 F. App'x 797, 800 (2d Cir. 2015) (summary order), which the Second Circuit has characterized as "exactly the sort of irreparable harm that preliminary injunctions are designed to address." Id. at 800-01 (Medicaid recipients would suffer irreparable harm in the absence of an injunction enjoining state officials from terminating, without notice, benefits for failure to appear at a hearing; recipients' very survival was threatened by denial of medical assistance benefits); see also Caldwell v. Blum, 621 F.2d 491, 493 (2d Cir. 1980) (plaintiffs, who were aged, blind or disabled New York residents, proved sufficient threat of irreparable harm to entitle them to relief against enforcement of the New York transfer-of-assets prohibition; "[t]hose medically needy applicants who [had] already transferred their assets and are being denied Medicaid benefits can hardly be expected to recover those assets for use in payment of medical bills; in the meantime they would, absent relief, be exposed to the hardship of being denied essential medical benefits"); Olson v. Wing, 281 F. Supp.2d 476, 486-87 (E.D.N.Y.) (Disaster Relief Medicaid recipients would be irreparably harmed in absence of preliminary injunction against state and city agencies requiring aid continuing until fair hearing decision was issued for those terminated; recipients denied

-16-

benefits and consequently unable to obtain medical services during pendency of fair hearing could suffer irreparable harm based on inability to obtain potentially life-saving treatment or medications during that period), aff'd, 66 F. App'x 275 (2d Cir. 2003). Here, Plaintiff is not being denied comprehensive medical services. Plaintiff, moreover, does not dispute that the present level of medical care he is receiving is appropriate.

The other cases cited by Plaintiff in support of his irreparable harm argument involved the provision of in-home medical care services and to that extent, share some factual similarities to his case. See, e.g., Haddad v. Arnold, 784 F. Supp.2d 1284, 1307-08 (M.D. Fla. 2010) ("The requirement that Plaintiff first enter a nursing home in order to be transitioned out sometime thereafter presents Plaintiff with exactly the kind of uncertain, indefinite institutionalization that can constitute irreparable harm.") (citing Long v. Benson, No. 4:08CV26-RH/WCS, 2008 WL 4571903, at *2 (N.D. Fla. Oct. 14, 2008) ("If a preliminary injunction is not issued, Mr. Griffin will run out of money and will have to move back into the nursing home. This will inflict an enormous psychological blow. Also, because of the very substantial difference in Mr. Griffin's perceived quality of life in the apartment as compared to the nursing home, each day he is required to live in the nursing home will be an irreparable harm. And if Mr. Griffin gives up his apartment, which is in an accessible and

subsidized complex for persons with disabilities, he may not get it back, even if he ultimately prevails in this litigation. In short, if a preliminary injunction is not issued, Mr. Griffin will suffer irreparable injury."), aff'd, 383 F. App'x 930 (11th Cir. 2010); Marlo M. ex rel. Parris v. Cansler, 679 F. Supp.2d 635, 638 (E.D. N.C. 2010) ("Plaintiffs have also clearly demonstrated they will suffer irreparable harm. Plaintiffs, who have a variety of mental illnesses and developmental disabilities, have lived successfully in their community based apartments. In the absence of an injunction, both Plaintiffs will lose funding and be forced from these community settings. The evidence at this point is strong that Plaintiffs will suffer regressive consequences if moved, even temporarily."); other citations omitted).

However, there is a critical difference between the foregoing cases cited by Plaintiff and the instant case: The plaintiffs in those cases faced the potential of being removed from their homes and institutionalized, absent injunctive relief mandating the continued provision of in-home care services. In other words, each of the movants presented a history of successfully living at home, albeit with varying levels of in-home assistance. Here, Plaintiff unfortunately has not returned home since suffering his stroke; he has either been hospitalized or living in a skilled nursing facility because of his functional limitations. In the cases cited by Plaintiff, it was essentially undisputed that the movants could

safely reside in their homes, provided that they _continued_ to receive the funding for the in-home care services they had been receiving. Here, it remains to be seen whether Plaintiff, given his current functional limitations, can safely reside in his home even with assistance. In short, the cases cited above involved maintenance of the status quo; Plaintiff's case demands a significant alteration of the status quo.

Plaintiff accuses VNA of "misrepresenting the harm it has undisputedly caused [him]," (Pl's Reply at 2 [#24]), namely, that he "remains confined in the nursing home because VNA has failed to provide him with the 24-hour in-home care services ordered in the [fair hearing] decision." (Id.). Plaintiff concedes that he has not raised a claim under the Americans with Disabilities Act of 1990 ("ADA"), 104 Stat. 337, 42 U.S.C. § 121, but argues that he has a right under the ADA "to live in the most integrated setting appropriate to his needs and [to] not suffer unnecessary institutionalization." (Id.) (citation omitted). The irreparable harm VNA is causing, Plaintiff argues, is his unnecessary institutionalization and its attendant effects on his mental health. Plaintiff avers that he has "depression and this process with its constant ups and downs has been very hard on [him]. . . . Every day [his] depression gets a little worse." (Declaration of Joseph Scofero ("Scofero Decl.") (Dkt #3-4), ¶¶ 26-27); see also Declaration of Gene Angelidis ("Angelidis Decl.") (Dkt #3-5), ¶ 38

(stating that he is Plaintiff's friend and that Plaintiff "seems to be more and more frustrated and depressed the longer he is confined to the nursing home"). However, in her declaration submitted in support of Plaintiff's motion, Robin Langmaid, FNP-PC ("Langmaid"), the Primary Care Family Nurse Practitioner at Brighton Manor, addresses only Plaintiff's "significant" physical limitations. She explains that Plaintiff "requires assistance with ambulation and currently uses a wheelchair. During therapy sessions, he is able to walk with a hemi walker[;] however he requires maximal assistance to do so. He also requires partial assistance with transfers, ambulation, and toileting. He also requires assistance with dressing, grooming, and other activities of daily living. He requires assistance with virtually all activities of daily living." (Langmaid Decl., ¶ 8). Plaintiff does not dispute this characterization of his functional limitations and level of care that he requires.

Notably, Langmaid does not mention Plaintiff's depression or any other psychological issues or symptoms. (See Declaration of Robin Langmaid ("Langmaid Decl.") (Dkt #3-6), ¶¶ 5-10). In the only paragraph that possibly could encompass Plaintiff's general mental status, Langmaid states that Plaintiff "has been in a stable plateau in the last two years that [she] ha[s] seen him. There has [sic] not been any significant changes." (Id., ¶ 10). That the only medical provider who submitted a supporting declaration has

opined that Plaintiff is "stable" undermines his ability to show a likelihood of irreparable harm to his mental status based on his continued stay at the nursing home. Even assuming that Plaintiff's evidentiary submissions are sufficient to demonstrate a likelihood of irreparable harm, they do not approach a showing that "extreme or very serious damage" to his mental health will result if this Court denies his motion.

### C.   Summary

The Court wishes to emphasize that its decision today does not shut the door on Plaintiff's quest to return home. VNA may not abandon its search for a home-care solution that will allow Plaintiff to transition out of the nursing home. The Fair Hearing Decision remains in effect, and VNA is bound to abide by it. It is apparent, however, that enabling Plaintiff to live at home safely will require a creative solution. Moreover, it will demand flexibility and cooperation on the part of everyone involved, including Plaintiff. Plaintiff must understand that his direction to VNA not to contact any of his family members was unproductive. Going forward, the Court strongly encourages all of the parties and their representatives to work collaboratively towards finding a workable solution.

### CONCLUSION

For the reasons discussed above, on the present record, Plaintiff cannot demonstrate (1) a "clear showing" of entitlement

to relief; or that (2) "extreme or very serious damage" will result if this Court denies mandatory injunctive relief. <u>Cacchillo</u>, 638 F.3d at 401. Accordingly, Plaintiff's Motion for a Preliminary Mandatory Injunction is denied without prejudice.

     **SO ORDERED.**

                     **S/ Michael A. Telesca**

                 _____
                 HONORABLE MICHAEL A. TELESCA
                 United States District Judge

DATED:    July 21, 2017
           Rochester, New York